IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Civil Action No. _____

| | |
|---|---|
| MEDENVIOS HEALTHCARE, INC.<br>7415 Corporate Ctr. Dr., Suite E, Miami, FL 33126<br><br>Plaintiff,<br>v.<br><br>XAVIER BECERRA, in his official capacity as Secretary, United States Department of Health and Human Services,<br>200 Independence Ave. S.W.<br>Washington, District of Columbia 20201,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT FOR JUDICIAL REVIEW**

Plaintiff, MedEnvios Healthcare, Inc., brings this Complaint for Judicial Review against Defendant Xavier Becerra, in his official capacity as Secretary of Health and Human Services, for violations of law in the design and execution of the statistical sampling and the calculation alleged overpayment amount, plus interest, on claims submitted to Medicare, for an audit review period of January 28, 2013 through January 28, 2016, and asserts as follows:

I.     **PARTIES**

1.     Plaintiff MedEnvios Healthcare, Inc. ("MedEnvios" or "Plaintiff") is a Florida for-profit corporation and nationwide for-profit supplier of diabetic durable medical equipment, prosthetics, orthotics, and supplies ("DMEPOS") with its principal place of business in Miami-Dade County, Florida at 7415 Corporate Ctr. Dr., Miami, FL 33126.

2. MedEnvios provides DMEPOS, including diabetes testing supplies, to Medicare beneficiaries throughout the country.

3. MedEnvios has completed all necessary requirements to be a Medicare DMEPOS supplier.

4. MedEnvios is enrolled in the Medicare program pursuant to a Medicare Enrollment Application submitted to Centers for Medicare and Medicaid Services ("CMS"), follows all applicable federal statutes and regulations, and has been enrolled as a DMEPOS supplier in the Medicare program at all times herein.

5. Defendant, Xavier Becerra, is named in his official capacity as the Secretary of the Department of Health and Human Services ("Secretary"). The Secretary's responsibilities include implementing and administering the Medicare program under Title XVIII of the Social Security Act, as amended, 42 U.S.C. § 1395 *et seq*.

6. The Secretary administers the Medicare program through CMS, which is an agency of the Department of Health and Human Services ("HHS"). *Id.*

7. CMS also directs its contractors, who are responsible for the first two levels of administrative review of Medicare denials.

8. The Office of Medicare Hearings and Appeals ("OMHA") generally conducts the third level in the Medicare claims appeal process and operates separately from the other contractors involved in the appeal process.

9. The Departmental Appeals Board ("DAB") within HHS provides the fourth level of administrative review.

10. References to the Secretary herein are intended to include CMS, its contractors, and any of their successors or predecessors.

## II.       JURISDICTION AND VENUE

11.     This action arises under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, and the Fifth Amendment of the United States Constitution.

12.     This Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g) as applied to Medicare appeals by 42 U.S.C. §1395ff, which authorizes judicial review of a final agency decision of the Secretary.

13.     The Plaintiff is filing suit after receiving a final decision of the Secretary denying coverage of their Medicare claims and affirming an extrapolated overpayment and, therefore, has exhausted their administrative remedies.

14.     Courts have held that where plaintiffs have bypassed the Medicare Appeals Council ("Council") in following the prescribed rules at 42 C.F.R. § 405.1132(a)–(b), "the [Administrative Law Judge's] opinion stands as the final decision of the Secretary" and "[j]udicial review of such final decisions lies with [a federal court] pursuant to 42 U.S.C. § 1395ff(b)(1)(A), which incorporates 42 U.S.C. § 405(g) and allows for judicial review of a final decision of the Secretary with respect to Medicare[.]" *Prime Healthcare Servs.—Montclair, LLC v. Hargan*, No. 17-cv-659, 2018 WL 333862, *1, *5 (C.D. Cal. Jan. 9, 2018).

15.     The amount-in-controversy is greater than $1,760 as set forth in 42 U.S.C. §§ 1395ff(b)(1)(E)(i) and 1395ff(b)(1)(E)(iii). *See also* 42 C.F.R. § 1006(d)(4).

16.     This suit is timely filed within 60 days of the date upon which Council was required to respond to MedEnvios' request for escalation to federal court, as prescribed by the rules governing escalation. *See* 42 C.F.R. § 405.1132(a)-(b); *see also* 42 C.F.R. §§ 405.1006(c), 1136(a)(1).

17.     In general, where a party seeks judicial review of the Secretary's final decision in the Medicare claims appeal context, venue is proper "in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the United States District Court for the District of Columbia." 42 U.S.C. § 405(g); 42 U.S.C. § 1395ff(b)(1)(A).

18.     Venue is proper in this Court as the Plaintiff's principal place of business is in Miami, Florida. *Id.*

## III.    STANDARD OF REVIEW

19.     A federal district court's review of a final decision of the Secretary as to Medicare coverage is limited to: (i) whether the Secretary's factual findings were supported by substantial evidence; (ii) whether the Secretary applied the proper legal standards; and (iii) whether the Secretary's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 42 U.S.C. § 405(g); 5 U.S.C. § 706(2)(A); *Sternberg v. Sec'y, Dep't Health & Human Servs.*, 299 F.3d 1201, 1205 (10th Cir. 2002) (holding that the substantial evidence test is substantively the same as the review for arbitrariness or caprice); *Porzecanski v. Azar*, 316 F. Supp. 3d 11, 17 (D.D.C. 2018), aff'd, 943 F.3d 472 (D.C. Cir. 2019); *LivinRite, Inc. v. Azar*, 386 F. Supp. 3d 644, 652 (E.D. Va. 2019); *Becker v. Sebelius*, No. 12-cv-6177, 2014 WL 2711958, *1, *3 (D.N.J. June 13, 2014) (internal citations omitted).

20.     Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted); *see also Fratellone v. Sebelius*, No.

08-cv-3100, 2009 WL 2971751 *1, *9 (S.D.N.Y. Sept. 16, 2009) (citing *Murphy v. Sec'y of Health & Human Servs.*, 62 F. Supp. 2d 1104, 1106 (S.D.N.Y. 1999)).

21.     While deferential, this review "is not a rubber stamp for the Secretary's decision and involves more than a search for evidence supporting the Secretary's findings." *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985) (citing *Tome v. Schweiker*, 724 F.2d 711, 713 (8th Cir. 1984).

22.     The court's factual review is usually limited to the administrative record. *See Mathews v. Weber*, 423 U.S. 261, 263, 270 (1976) (holding that under 42 U.S.C. § 405(g), the "court may consider only the pleadings and administrative record" and "neither party may put any additional evidence before the district court.").

23.     However, there are exceptions to this general rule. Discovery and supplementation of the administrative record are appropriate where (1) "there was such failure to explain administrative action as to frustrate effective judicial review," (2) it appears that the agency has relied on substantial records and materials not included in the record, or (3) "supplementation of the record through discovery is necessary to permit explanation or clarification of technical terms or subject matter involved in the agency action under review." *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973); *Pub. Power Council v. Johnson*, 674 F.2d 791, 794 (9th Cir. 1982); *see also Fratellone*, 2009 WL 2971751, at *7 (opting to "consider [plaintiff's affidavit] as an aid to understand and highlight [plaintiff's] position" and because it assisted the "court in navigating through a plethora of medical terminology and files, which ma[d]e up the administrative record, and help[ed] th[e] court address the narrow issue of whether or not the Secretary's decision was supported by substantial evidence.").

24.     The assessment of whether substantial evidence supports a decision of the Secretary requires the court to review the administrative record as a whole. This includes looking at evidence supporting the Secretary's position, as well as other evidence that detracts from it. *Goffney v. Becerra*, 995 F.3d 737, 747 (9th Cir. 2021); *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002); *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990); 5 U.S.C. § 706. HHS "has codified [this] requirement in a regulation that directs the Office of Medicare Hearings and Appeals . . . to include in the record 'the appealed determinations, and documents and other evidence used in making the appealed determinations and the ALJ's or attorney adjudicator's decision,' as well as any proffered evidence excluded by the adjudicator." *Goffney*, 995 F.3d at 747 (quoting 42 C.F.R. § 405.1042(a)(2)).

25.     In contrast to the deference due to findings of fact, the Secretary's (or in this case Administrative Law Judge's ("ALJ") conclusions of law as to Medicare coverage are reviewed *de novo*, and failure to apply the correct legal standards is grounds for reversal. 42 U.S.C. § 405(g); *see also Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004); *Keefe v. Shalala*, 71 F.3d 1060, 1062 (2d Cir. 1995).

26.     Pursuant to the Administrative Procedures Act ("APA"), the Secretary's final decision may also be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D); *Mercy Cmty. Hosp. v. Heckler*, 781 F.2d 1552, 1554 (11th Cir. 1986) (citing 5 U.S.C. § 706(2)(A)); *see also Palomar Med. Ctr. v. Sebelius*, 693 F.3d 1151, 1159 (9th Cir. 2012); *Porzecanski*, 316 F. Supp. 3d at 17; *LivinRite*, 386 F. Supp. 3d at 652.

27.     To meet the requirements of the APA, an agency must "examine the relevant data and articulate a satisfactory explanation for its action." *FCC v. Fox Television Stations, Inc.*, 556

U.S. 502, 513 (2009) (internal citations omitted); *see also Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1321 (11th Cir. 2021).

28.     In reviewing that explanation, the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Porzecanski*, 316 F. Supp. 3d at 18.

29.     An agency will have acted arbitrarily and capriciously where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43; *see also Porzecanski*, 316 F. Supp. 3d at 18.

30.     An agency will have failed to act in accordance with law where it acts contrary to "any law, and not merely those laws that the agency itself is charged with administering." *F.C.C. v. NextWave Pers. Commc'ns., Inc.*, 537 U.S. 293, 300 (2003) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14 (1971) ("In all cases agency action must be set aside if the action was . . . not in accordance with law or if the action failed to meet statutory, procedural or constitutional requirements." (internal quotations omitted))).

31.     The United States District Court for the Southern District of Florida has made clear that where "a complaint seeks review of agency action under the APA, . . . '[t]he entire case on review is a question of law,' and the reviewing district court sits not as a finder of fact but 'as an appellate court.'" *Pinero v. Jaddou*, No. 22-cv-16644267, 2022 WL 16644267, *4 (S.D. Fla. Oct.

26, 2022) (quoting *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)).

## IV.    HIERARCHY OF AUTHORITY

32.    Where there is a conflict between a statute and a regulation, or a statute and CMS guidance manuals, such as the Medicare Program Integrity Manual ("MPIM"), the statute will govern. *Wolf Creek Collieries v. Robinson*, 872 F.2d 1264, 1267 (6th Cir. 1989) ("statutory language . . . prevail[s] over inconsistent regulatory language"); see also *Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*, 297 U.S. 129, 134 (1936) (noting that a regulation operating to create a rule out of harmony with a statutes is a "mere nullity").

33.    While a regulation will not override a conflicting statute, such a regulation will govern over the MPIM and other CMS program guidance.

34.    The Federal Regulations governing the Medicare claims appeal process illustrate this hierarchy. *See generally,* 42 C.F.R. §§ 405.1060, 405.1062, 405.1063.

35.    These regulations state, in relevant part, that "[a]ll laws and regulations pertaining to the Medicare and Medicaid programs . . . are binding on ALJs and attorney adjudicators, and the Council." *Id.* at § 405.1063(a).

36.    In contrast, ALJs and the Council "are not bound by LCDs . . . *or CMS program guidance, such as* program memoranda and *manual instructions*[.]" *Id.* at § 405.1062(a) (emphasis added).

37.    The Social Security Act itself also explicitly notes that unless promulgated as a regulation by CMS, "[n]o rule, requirement, or other statement of policy (other than a national coverage determination)" can establish or change a substantive legal standard governing the scope of benefits or payment for services under the Medicare program. 42 U.S.C. § 1395hh(a)(2).

38.     The statistical sampling and extrapolation guidelines set out in the MPIM are entitled only to *Skidmore*[1] deference. *Rio Home Care, LLC v. Azar*, No. 17-cv-116, 2019 WL 1411805, at *26 (S.D. Tex. Mar. 11, 2019) (citing *Baylor Cnty. Hosp. Dist. v. Price*, 850 F. 3d 257, 261–64 (5th Cir. 2017) (applying *Skidmore* deference to CMS' State Operations Manual)).

39.     In short, where a conflict exists between a statute and a regulation, or a statute and the MPIM, the statute will govern. Likewise, a regulation will govern over conflicting language in the MPIM. *See e.g.*, *Porzecanski v. Azar*, 943 F.3d at 480 (D.C. Cir. 2019) (discussing this hierarchy in finding that while applicable Local Coverage Determinations ("LCDs") are afforded substantial deference, "ALJs and the Council are not bound to follow the determination made by the issuing contractor.").

## V.     MEDICARE PROGRAM

40.     Congress enacted the Medicare Program in 1965 under Title XVIII of the Social Security Act to provide health insurance primarily to individuals sixty-five years of age and older, disabled persons, and those with end-stage renal disease. Social Security Amendments of 1965, Pub. L. No. 89-97, 79 Stat. 286 (1965) (codified as amended at 42 U.S.C. §§ 1395-1396v).

41.     The Medicare Program seeks to ensure that its beneficiaries have access to health care services. *Id.* at 286.

42.     The Medicare Program is made up of four separate parts—Part A, Part B, Part C, and Part D.

43.     Relevant to this matter, Medicare Part B refers to the supplementary medical insurance program authorized under Part B of Title XVIII of the Social Security Act. 42 U.S.C. § 1395k(a)(1); 42 C.F.R. § 400.202. Part B supplements Part A by covering other medical services

---

[1] *Skidmore v. Swift & Co*., 323 U.S. 134 (1944).

enumerated at 42 U.S.C. §§ 1395k and 1395x, which include diagnostic laboratory tests and other diagnostic tests. *See also* 42 C.F.R. § 410.10.

44.     Providers and suppliers enroll in the Medicare Program by completing an application and undergoing a certification process to verify their licensing and other credentials. Providers and suppliers enroll with the Medicare Administrative Contractor ("MAC") for CMS to administer claims for the Medicare benefit category applicable to the provider or supplier's covered services for the geographic locale in which the provider is physically located. 42 C.F.R. § 421.404(b)(1), (c)(1).

45.     Under Medicare Part B, beneficiaries pay a monthly premium to receive coverage for the various forms of supplementary medical services that are enumerated at 42 U.S.C. § 1395x.

46.     Federal district courts have recognized that "Medicare Part B beneficiaries have a protected due process 'property interest' in 'receiving the medical insurance benefits for which they paid a monthly premium.'" *Bailey v. Mut. of Omaha Ins. Co.*, 534 F. Supp. 2d 43, 53–54 (D.D.C. 2008) (quoting *Gray Panthers v. Schweiker*, 652 F.2d 146, 148 n. 2 (D.C. Cir. 1980)); *see also Barrows v. Becerra*, 24 F.4th 116, 133, 140 (2d Cir. 2022) (holding that Medicare beneficiaries have "a property interest in coverage under Medicare . . . that is cognizable under the Due Process Clause" in affirming *Alexander v. Azar*, No. 11-cv-1703, 2020 WL 1430089 (D. Conn. Mar. 24, 2020)).

47.     While beneficiaries are the primary parties in interest to the Medicare Part B program, providers and suppliers are likewise parties in interest "as assignees of the beneficiaries." *Cervoni v. Sec'y, Health, Educ. & Welfare*, 581, F.2d 1010, 1018; 42 C.F.R. § 400.202; *see also A1 Diabetes & Med. Supply v. Azar*, 937 F.3d 613, 619 (6th Cir. 2019) (finding that the provider "plainly ha[d] a significant 'private interest': payment for services rendered"); *Med-Cert Home*

*Care, LLC v. Azar*, 365 F. Supp. 3d 742, 751 (N.D. Tex. 2019) (stating that "[p]recedent makes clear that [the provider] has a valid property interest in receiving Medicare payments for services rendered").

48.     The federal district courts of Florida recognize the rights of providers and suppliers under the Medicare Program, stating that "[t]he purpose of Medicare . . .  is to reimburse private providers for the cost of health care provided to eligible individuals[.]" *Fla. Med. Ctr., Inc. v. Shalala*, No. 94-7026-CIV-KLR, 1996 WL 636141, *7 (S.D. Fla. 1996);  see also *Mem'l Hosp. v. Heckler*, 706 F.2d 1130, 1132 (11th Cir. 1983) (noting that providers "are entitled to reimbursement for reasonable costs incurred in providing necessary health services to Medicare beneficiaries); *Am. Med. Int'l, Inc. v. Sec'y, Health, Educ. & Welfare*, 466 F. Supp. 605, 626 (D.D.C. 1979) ("[t]he purpose of the Medicare [P]rogram is to reimburse providers for their reasonable costs.").

49.     In practice, when medical providers and suppliers, such as MedEnvios, furnish services to a Medicare Part B beneficiary, the providers or suppliers thereafter submit a claim for reimbursement based on the beneficiary's assignment of their property interest to the provider or supplier.

50.     Medicare providers and suppliers are statutorily entitled to reimbursement for services rendered to Medicare Part B beneficiaries under 42 U.S.C. § 1395l.

51.     Providers and suppliers submit these claims for reimbursement to a MAC. 42 U.S.C. § 1395ff(a)(2)(A). As discussed in Section V.A.1 below, MACs are government contractors responsible for processing Medicare claims and making payments. 42 U.S.C. § 1395kk-1(a)(3).

### A.     Entities Involved in Medicare Claims Appeal Process

52.     While CMS is the HHS agency responsible for administering the Medicare Program, CMS has contracted with various private entities to assist CMS in processing and auditing claims for reimbursement, and in the appeals process itself.

#### 1.     Medicare Administrative Contractors

53.     CMS contracts with MACs to process and audit claims that have been submitted by Medicare providers for payment in a particular geographic jurisdiction of the country. 42 U.S.C. § 1395kk-1(a).

54.     By statute, CMS is authorized to "enter into contracts with any eligible entity to serve as a [MAC.]" *Id.* at § 1395kk-1(a)(1).

55.     MACs are statutorily authorized to perform the following functions: (i) determining the amount of reimbursement to providers and suppliers; (ii) paying such reimbursements to the applicable provider or supplier; (iii) providing education and assistance to Medicare Part A and B beneficiaries; (iv) providing consultative services to institutions, agencies, and others regarding maintenance of fiscal records necessary for reimbursement; (v) communicating with providers and suppliers regarding instructions from CMS; (vi) performing functions related to provider education, training, and technical assistance; (vii) developing LCDs, which are determinations "under [P]art A or [P]art B, as applicable, respecting whether or not a particular item or service is covered . . . under such parts" for the geographic zone assigned to the MAC; (viii) overseeing an improper payment outreach and education program; and (ix) such other functions as are necessary or as specified in CMS' agreement with the MAC. *Id.* at §§ 1395kk-1(a)(4), 1395ff(f)(2)(B); 42 C.F.R. §§ 421.100, 421.200, 421.400.

56.     In addition, MACs handle provider and supplier enrollment, as well as redeterminations, which form the first level of the Medicare claims appeal process. 42 C.F.R. §§ 421.200, 421.404.

57.     Each MAC is designated to perform its duties for a specific geographic jurisdiction of the country. *See* 42 C.F.R. § 421.400(a); *see also* CMS, "Who are the MACs," (Dec. 1, 2021), https://www.cms.gov/Medicare/Medicare-Contracting/Medicare-Administrative-Contractors/Who-are-the-MACs#MapsandLists.

58.     Despite being jurisdictionally bound, MACs are required to follow federal statutes, regulations, and CMS program guidance.

59.     A MAC may be held liable to the United States for a Medicare payment if, in connection with such payment, the MAC acted with "reckless disregard" of its obligations under its Medicare administrative contract. 42 U.S.C. § 1395kk-1(d)(3).

60.     Where a MAC—or director, officer, or employee of the MAC—is made party to a judicial or administrative proceeding arising from or relating directly to the Medicare claims appeal process, the Secretary may not indemnify the MAC if liability is determined to be criminal in nature, fraudulent, or grossly negligent. *Id.* at § 1395kk-1(d)(4).

61.     CMS structures its contracts with MACs as "cost-plus-award-fee" contracts, which are a type of cost-reimbursement contract allowing an agency to provide incentives to contractors if they achieve specific performance goals. *See e.g.*, CMS, "Fact Sheet: Award of Medicare Administrative Contractor (MAC) Contract for Jurisdiction J" (Sept. 2014), https://www.cms.gov/Medicare/Medicare-Contracting/Medicare-Administrative-Contractors/Downloads/Award-Background-J-J-Sept-2014.pdf; *see also* 42 U.S.C. § 1395kk-1(b)(1)(D)(i).

62.     Specifically, CMS is required to provide incentives to MACs to reduce improper payment error rates in their jurisdictions, which may include: (i) a sliding scale of award fee payments and additional incentives to MACs that reduce the improper payment rates in their jurisdictions to certain thresholds, or accomplish tasks that further improve payment accuracy; or (ii) substantial reductions in award fee payments under cost-plus-award-fee contracts for MACs that reach an upper end improper payment rate threshold, or fail to accomplish tasks that further improve payment accuracy. *Id.* at § 1395kk-1(b)(1)(D)(ii)–(iii).

63.     In addition, CMS is statutorily mandated to use specific claims payment error rates or similar methodologies in processing and reviewing Medicare claims in order to give MACs an incentive to implement effective education and outreach programs to providers and suppliers. *Id.* at § 1395kk-1(f).

## 2. Zone Program Integrity Contractors and Unified Program Integrity Contractors

### a. ZPICs

64.     Payment decisions made by MACs had been commonly audited by Zone Program Integrity Contractors ("ZPICs") through 2016, and presently by Unified Program Integrity Contractors, in a process referred to as a "post-payment review" of certain healthcare providers. 42 C.F.R. § 421.304 *et seq*.

65.     In accordance with 42 U.S.C. § 1395ddd, as amended by Title II § 202 of the Health Insurance Portability and Accountability Act ("HIPAA") of 1996, CMS was authorized to contract with ZPICs to fulfill program integrity functions for the Medicare Program.

66.     ZPICs were charged with performing benefit integrity activities aimed to reduce fraud, waste, and abuse in the Medicare program. 42 U.S.C. § 1395ddd.

67.     The contract between CMS and a ZPIC specified the functions the ZPIC was to perform, and included any or all of the following functions: (i) conducting medical reviews, utilization reviews, and reviews of potential fraud related to activities of providers and other individuals furnishing services for which Medicare payment may have been made either directly or indirectly; (ii) auditing, settling and determining cost report payments for providers of services, or other individuals or entities, as necessary to help ensure proper Medicare payment; (iii) determining whether a payment was authorized under 42 U.S.C. § 1395y(b) and recovering mistaken and conditional payments therefrom; (iv) educating providers, suppliers, beneficiaries, and others regarding payment integrity and benefit quality assurance issues; and (v) developing, and periodically updating, a list of items of durable medical equipment that were frequently subject to unnecessary utilization throughout the ZPIC's entire service area, in accordance with 42 U.S.C. § 1395m(a)(15). 42 U.S.C. § 1395ddd(b); 42 C.F.R. § 421.304; MPIM, CMS Pub. 100-08, Ch. 4, § 4.2.2.1.[2]

68.     One of the tools that ZPICs, and other Medicare contracting entities, use in performing their duties is statistical sampling and extrapolation, as described in the MPIM. 42 U.S.C. § 1395ddd; *see also* MPIM Ch. 8, § 8.2 (noting that "[i]f a large number of claims are involved, contractors consider using statistical sampling for overpayment estimation to calculate the amount of the overpayment.").

69.     ZPICs were tasked with identifying both overpayments and underpayments. *See e.g.*, 42 U.S.C. §§ 1395ddd(b), 1395g(a); 42 C.F.R. § 421.304; MPIM Ch. 8, §§ 8.4.1.3, 8.4.4.4.4, 8.4.5.2, 8.4.7.1.

---

[2] Unless otherwise noted, citations to the MPIM are to the 2011 version of the MPIM, which was the version in effect at the time of the audit.

70.     Each ZPIC was designated to perform its duties for a specific geographic jurisdiction of the country. *See e.g.*, HHS, Office of Inspector General, "Enhancements Needed in the Tracking and Collection of Medicare Overpayments Identified by ZPICs and PSCs," OEI-03-13-00630, at 2 (Sept. 2017).

71.     ZPICs—and their employees and professional consultants—were only protected from criminal or civil liability in regard to the program integrity activities they performed under their contracts with CMS so long as they exercised due care in carrying out these activities. 42 C.F.R. § 421.316(a); MPIM Ch. 4, § 4.2.2.4.

72.     ZPICs were awarded task orders which specified the requirements for the benefit integrity work that the ZPIC would perform. The task order covering detecting, deterring, and preventing fraud, waste and abuse within the ZPICs jurisdiction allowed for the ZPIC to be paid on a "fee for service" basis. *See e.g.*, HHS, Office of Inspector General, "Enhancements Needed in the Tracking and Collection of Medicare Overpayments Identified by ZPICs and PSCs," OEI-03-13-00630, at 3; Government Accountability Office ("GAO"), *Decision in re Cahaba Safeguard Administrators, LLC*, B-401842.2, at 2 (Jan. 25, 2010).

73.     In addition to their fixed contractual rate compensation, ZPICs could also be awarded additional fees per task order per year to recognize high quality of service and administrative actions. GAO, "Report to Congressional Requesters - Medicare Program Integrity: Contractors Reported Generating Savings, but CMS Could Improve Its Oversight," GAO-14-111, at 12 (Oct. 2013); *see also* CMS, "Medicare Integrity Program (MIP) ZPIC Zone 5 Task Order 0001 Award Fee Plan," https://sam.gov/opp/81f6cb481f907f70c66525b3300c3191/view#attachments-links.

**b.    UPICs**

74.    In the Fiscal Year 2016, CMS began transitioning from ZPICs to Unified Program Integrity Contractors ("UPICs"). *See* CMS, Fiscal Year 2016: Justification of Estimates for Appropriations Committees, at 205.

75.    As with ZPICs, CMS is authorized to contract with UPICs to fulfill program integrity functions for the Medicare Program. 42 U.S.C. § 1395ddd.

76.    The UPIC is authorized to: (i) prevent fraud by identifying program vulnerabilities; (ii) proactively identify incidents of potential fraud, waste, and abuse that exist within its service area and take appropriate action; (iii) investigate allegations of fraud; (iv) explore available sources of fraud leads in its jurisdiction; (v) initiate appropriate administrative actions where there is reliable evidence of fraud, including, but not limited to, payment suspensions and revocations; and, (vi) refer any necessary provider or supplier outreach to the provider outreach and education staff at the MAC. 42 U.S.C. § 1395ddd(b); 42 C.F.R. § 421.304; 42 C.F.R. § 405.371(a)(1); MPIM Ch. 4, § 4.2.2.1.

77.    UPICs—and their employees and professional consultants—are only protected from criminal or civil liability in regard to the program integrity activities they perform under their contracts with CMS so long as they exercise due care in carrying out these activities. *Id.* at § 421.316(a); MPIM Ch. 4, § 4.2.2.4.

78.    UPICs are tasked with identifying both overpayments and underpayments. *See e.g.*, 42 U.S.C. §§ 1395ddd(b), 1395g(a); 42 C.F.R. § 421.304; MPIM Ch. 8, §§ 8.4.1.3, 8.4.4.4.4, 8.4.5.2, 8.4.7.1.

79.    As with ZPICs, each UPIC is designated to perform its duties for a specific geographic jurisdiction of the country. *See e.g.*, CMS, "Review Contractor Directory - Interactive

Map" (Dec. 1, 2021), https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-FFS-Compliance-Programs/Review-Contractor-Directory-Interactive-Map.

80.     UPICs are awarded one of CMS' five UPIC multiple-award indefinite-delivery, indefinite-quantity ("IDIQ") contracts for the five UPIC geographic jurisdictions, and these IDIQ contracts contemplate a "cost plus award fee" payment model. *See e.g.*, GAO, *Decision in re AdvanceMed Corp.*, B-415360; B-415360.2; B-415360.3, at 2 (Dec. 19, 2017); CMS, "UPIC Jurisdiction 1 Task Order, Statement of Work," at 1,

https://sam.gov/opp/c5df515b5cf3afcb0d8fcd4e20c7acba/view#attachments-links.

81.     Generally, UPICs are paid a base fee in addition to an award fee that is awarded based on quality (e.g., accuracy, timeliness, and efficiency in performing tasks), management (i.e., how the UPIC communicates and coordinates with stakeholders), and certain other areas, such as innovation and value-added work. *See* CMS, "UPIC Jurisdiction 1 Award Fee Plan," at 2–3, 6, https://sam.gov/opp/c5df515b5cf3afcb0d8fcd4e20c7acba/view#attachments-links.

82.     In addition, starting in year two of a contract or task order, the UPIC has the potential for an "Excellence Award" that will be based on the Center for Program Integrity ("CPI") reaching its Return on Investment ("ROI") and the UPIC itself achieving high marks in its evaluation. *Id.* at 9–11.

### 3.     Qualified Independent Contractors

83.     Under 42 U.S.C. § 1395ff, CMS is mandated to "enter into contracts with qualified independent contractors to conduct reconsiderations of [redetermination decisions.]" Contracts between CMS and qualified independent contractors are to last for an initial term of three years and are renewable on a triennial basis thereafter. 42 U.S.C. § 1395ff(c)(1).

84.     A qualified independent contractor ("QIC") is statutorily required to be independent of any MAC, ZPIC, or UPIC. *Id.* at § 1395ff(c)(2), (c)(3)(K).

85.     The QIC must perform such duties and functions and assume such responsibilities as may be required by CMS to carry out the Medicare claims appeal process, "and shall have sufficient medical, legal, and other expertise . . . and sufficient staffing to make reconsiderations[.]" *Id.* at § 1395ff(c)(3)(A).

86.     Each QIC is designated to perform its duties for a specific geographic jurisdiction of the country or by type of service. *See e.g.*, CMS, "Second Level of Appeal: Reconsideration by a Qualified Independent Contractor," (June 23, 2022), https://www.cms.gov/Medicare/Appeals-and-Grievances/OrgMedFFSAppeals/ReconsiderationbyaQualifiedIndependentContractor.

87.     National coverage determinations ("NCDs"), CMS Rulings, Council decisions, and applicable laws and regulations are binding on the QIC. However, QICs are not bound by LCDs or CMS program guidance—though applicable regulations indicate that a QIC should "give substantial deference to these policies if they are applicable to a particular case." 42 U.S.C. § 1395ff(c)(3)(B)(ii)(I)–(II); 42 C.F.R. § 405.968(b)(1)–(2).

88.     As with ZPICs and UPICs, QICs—and persons employed by or in a fiduciary relationship with a QIC—are only protected from criminal or civil liability in regard to the duties, functions, or activities they perform under their contracts with CMS so long as they exercise due care in carrying out these duties, functions, or activities. *Id.* at § 1395ff(c)(5).

89.     Compensation provided by CMS to a QIC in connection with reconsideration reviews and decisions "shall not be contingent on any decision rendered by the [QIC] or by any reviewing professional." *Id.* at § 1395ff(c)(3)(K).

90.     Similarly, any compensation provided by a QIC to a reviewer in connection with redetermination reviews and decisions must not be contingent on any decision rendered by the reviewer. *Id.* at § 1395ff(g)(3).

### 4.     Administrative Law Judges

91.     OMHA is responsible for the third level of the Medicare claims appeal process, whereby a reconsideration decision by the QIC is reviewed by an OMHA adjudicator, and an ALJ hearing can be requested. 42 U.S.C. § 1395ff(b)(1); 42 C.F.R. §§ 405.1000–48.

92.     OMHA was created by the Medicare Modernization Act of 2003 in an effort to make the appeals process more efficient, and OMHA is functionally and organizationally independent of CMS. *See* Pub. L. No. 108-173, 117 Stat. 2066 (2003); *see also* CMS, MLN006562, Medicare Parts A & B Appeals Process (May 2021).

93.     A hearing may be requested before an ALJ under the regulatory requirements included at 42 C.F.R. § 1000.1014 where the request for hearing is filed within sixty calendar days after receipt of the notice of the QIC's reconsideration decision and so long as the amount in controversy requirement is met. 42 C.F.R. §§ 405.1002, 405.1006.

94.     The purpose of a hearing before an ALJ is to provide important procedural due process protections to an appellant-provider/supplier, including "the opportunity to have a live hearing, present testimony, submit written statements of law and fact, and cross-examine witnesses." *Med-Cert*, 365 F. Supp. 3d at 753 (citing *Family Rehab., Inc. v. Azar*, 886 F.3d 496, 499 (5th Cir. 2018).

95.     In contrast, the Council "may, but is not required to conduct additional proceedings, including a hearing." *Med-Cert*, 365 F. Supp. 3d at 753.

96.     The ALJ reviews an appeal under a *de novo* standard, which is less deferential than the standard of review applied by a district court. *Id.* at 754; *see also Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 191 (D.C. Cir. 2016) (concluding that a district court's review would be more deferential than an ALJ's *de novo* review in the Medicare claims appeal process).

97.     Where a provider or supplier disagrees with how a statistical sample and/or extrapolation was conducted, the provider or supplier must assert the reasons they disagree with how the statistical sampling and/or extrapolation was conducted in the request for an ALJ hearing. 42 C.F.R. § 405.1014(a)(3).

98.     CMS has made clear that this requirement to include the reasons for disagreement with how the statistical sample and/or extrapolation was conducted "does not limit the appellant's ability to provide additional information or arguments during the course of the appeal." Rather, the requirement exists to "provide the adjudicator with information on the appellant's basis for the appeal and is necessary to evaluate the record[.]" 82 Fed. Reg. 4974, 5033 (Jan. 17, 2017).

99.     The ALJ is required to conduct "a *de novo* review" and to issue a decision "based on the administrative record, including . . . any hearing record." 42 C.F.R. § 1000(d).

100.    The ALJ's decision "must be based on evidence offered at the hearing or otherwise admitted into the record, and shall include independent findings and conclusions." *Id.* at § 405.1046(a)(1). Further, the ALJ's decision may not be based on extra-record documents. *Id.*

101.    CMS has explained that the "independent findings and conclusions" requirement is intended to express the requirement for *de novo* review and prohibits the ALJ from "merely incorporat[ing] the findings and conclusions offered by others" at the redetermination or reconsideration level. 82 Fed. Reg. 4974 at 5082, 5084.

102.     In addition to the specific reasons for the decision and a summary of any clinical or scientific evidence used in making the decision, the ALJ's decision must also include, "for any new evidence that was submitted for the first time at the OMHA level . . . a discussion of the new evidence[.]" 42 C.F.R. § 405.1046(a)(2)(i)–(ii).

103.     ALJ decisions have been vacated where the ALJ's decision did not address relevant evidence, such as expert reports, and/or hearing testimony relevant to statistical sampling and extrapolation. *See e.g.*, *Strategic Ambulance (Appellant) (Beneficiaries) Palmetto GBA (Contractor) Claim for Supplementary Medical Insurance Benefits (Part B)*, No. M-10-770, 2012 WL 1980570 (H.H.S. Mar. 19, 2012); *Jackson Healthcare (Appellant) (Beneficiary) Cahaba GBA (Contractor) Claim for Hospital Insurance Benefits (Part A)*, No. M-11-259, 2012 WL 889345 (H.H.S. Jan. 25, 2012) (reversing the ALJ's decision for neglecting to evaluate the testimony of two experts in its decision); *Simon Becker, DPM (Appellant) (Beneficiary) Safeguard Services (PSC) (Contractor) Claim for Supplementary Medical Insurance Benefits (Part B)*, No. M-11-1657, 2011 WL 7007042 (H.H.S. Aug. 17, 2011) (stating that "the ALJ's failure to provide any meaningful analysis or specific reasons for his decision with respect to sampling does not result in a decision that is calculated to be understood" as required by applicable regulations).

104.     In issuing a decision, ALJs are bound by all laws and regulations pertaining to the Medicare program, including Title XVIII of the Social Security Act and applicable implementing regulations. CMS Rulings, precedential Council decisions, and NCDs are likewise binding on the ALJ. 42 C.F.R. § 405.1063.

105.     ALJs are not bound by LCDs or CMS program guidance, but will give substantial deference to these policies if they are applicable to a particular case. *Id.* at § 405.1062(a).

106.    The ALJ must consider "all the issues for the claims . . . specified in the request for hearing that were brought out in the initial determination, redetermination, or reconsideration that were not decided entirely in [the appellant's] favor." *Id.* at § 405.1032(a).

107.    Where an appellant "asserts a disagreement with how a statistical sample and/or extrapolation was conducted in the request for hearing . . . in deciding issues related to how [the] statistical sample and/or extrapolation was conducted, the ALJ or attorney adjudicator must base his or her decision on a review of the entire sample to the extent appropriate to decide the issue." *Id.* at § 405.1032(d).

108.    In conjunction with its review and decision, the ALJ has a regulatory duty to build the administrative record. This administrative record must include the originally-appealed decisions, the documents and other evidence used in making those appealed decisions, the ALJ's decision, and all other evidence. *Id.* at § 405.1042(a).

109.    OMHA's ALJs have also been granted the authority to compel CMS and its contractors to produce documents related to the issues that are before an ALJ. Specifically, "[i]f an ALJ . . . believes that the written record is missing information that is essential to resolving the issue on appeal and that information can be provided only by CMS or its contractors, the information may be requested from the QIC that conducted the reconsideration or its successor." *Id.* at § 405.1034(A). Missing information that "can be provided only by CMS or its contractors" is information that "is not publicly available, is not in the possession of, and cannot be request and obtained by one of the parties." *Id.* at § 405.1034(a)(2). It is also within the authority of ALJs to issues subpoenas to require entities—including those not party to an ALJ hearing—to produce existing documents. *Id.* at § 426.405(c)(11).

110.     Relatedly, the Fifth Circuit Court of Appeals has held that the effectuation of a final agency decision is "inextricably intertwined" with the agency's initial action, thus, making effectuation an essential component of resolving ALJ appeals. *D&G Holdings, LLC v. Becerra*, 22 F.4th 470 (5th Cir. 2022).

111.     Effectuation includes an accounting of the amount of payment owed by a provider. Federal courts have made clear that "[i]t is inexcusable that the Secretary would allow [a MAC] to wield the sovereign authority of the United States to seize money from a private company but then be utterly unable to give an accounting for the amount pillaged." *D&G Holdings, LLC v. Azar*, 776 F. App'x 845, 848 (5th Cir. 2019).

112.     Given the regulatory authority granted to ALJs, it is in the purview of an ALJ to require that CMS or its contractor perform a full accounting of a provider's debts where missing documentation regarding the total amount recouped can only be provided by CMS or its contractors.

113.     The ALJ's decision on a request for hearing is binding on all parties unless "a party requests a review of the decision by Council within the stated time period or the Council reviews the decision issued by an ALJ . . . and the Council issues a final decision . . . or the appeal is escalated to Federal district court under the provision at [42 C.F.R.] § 405.1132[.]" 42 C.F.R. § 405.1048(a)(1).

### 5.     Medicare Appeals Council

114.     Where a party is dissatisfied with the ALJ's decision that party may appeal the ALJ's decision up to the Council, and the Council is statutorily authorized to review the ALJ's decision. 42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. §§ 405.1100(a), 405.1102(a)(1).

115.     In reviewing the ALJ's decision, the Council is required to undertake a *de novo*

review. 42 C.F.R. § 405.1100(c). In conducting its review *de novo*, the Council must consider all of the evidence in the administrative record. *Id.* at §§ 405.1108(a), 405.1122(a)(1).

116.     As with ALJs, in conducting its review, the Council is bound by all laws and regulations pertaining to the Medicare program, including Title XVIII of the Social Security Act and applicable implementing regulations. CMS Rulings, precedential Council decisions, and NCDs are likewise binding on the Council. *Id.* at § 405.1063.

117.     The Council is not bound by LCDs or CMS program guidance, but will give substantial deference to these policies if they are applicable to a particular case. *Id.* at § 405.1062(a).

118.     In reviewing an ALJ's decision, the Council will issue a final decision or dismissal order or remand a case to the ALJ within 90 calendar days of receipt of the appellant's request for review, unless that period is extended. *Id.* at §§ 405.1100(c), 405.1108(a); 405.1128.

119.     As discussed in Section V.B.5, if Council does not issue a decision, dismissal or remand within 90 days, the appealing party may file a request to escalate the case to a federal district court for judicial review. *Id.* at § 405.1132(a).

120.     Where the Council issues a decision, that decision will act as the final decision of the Secretary for purposes of 42 U.S.C. § 405(g) and § 1395ff(b)(1)(A) and is final and binding on all parties unless a Federal district court issues a decision modifying the Council's decision. 42 C.F.R. § 405.1130.

121.     If the appellant files a request to bypass the Council and escalate the case to a federal district court, the ALJ's decision will act as the final decision of the Secretary. *Prime Healthcare Servs.—Montclair, LLC*, 2018 WL 333862, at *5.

6.     **Department of Health and Human Services - Office of Inspector General**

122.    The Office of Inspector General for HHS ("HHS-OIG") is tasked with oversight of HHS, including CMS, for purposes of "preventing fraud and abuse and promoting economy, efficiency, and effectiveness of HHS programs and operations." HHS-OIG, Statement of Organization, Functions, and Delegations of Authority, 83 Fed. Reg. 55553, 55553 (Nov. 6, 2018); *see also* 5a U.S.C. § 2 (stating the purposes for establishment of HHS-OIG and other Offices of Inspector General for various departments and agencies).

123.    HHS-OIG carries out this oversight role objectively. *See* 83 Fed. Reg. 55553 at 55553; *see also* HHS-OIG, "About OIG," OIG.HHS.GOV, https://oig.hhs.gov/about-oig/ (last visited Dec. 13, 2022).

124.    In its role as an oversight agency, HHS-OIG has dual reporting obligations to the Secretary and to Congress. HHS-OIG, "HHS-OIG Fact Sheet," (last updated June 2022), https://oig.hhs.gov/documents/root/1037/About-OIG-Fact-Sheet-June2022.pdf.

125.    HHS-OIG's oversight role includes "recommend[ing] policies for . . . the purpose of promoting economy and efficiency in the administration of, or preventing and detecting fraud and abuse in, [HHS'] programs and operations[.]" 5a U.S.C. § 4(a)(3); *see also Id.* § 2(2) (stating that HHS-OIG was established, in part, to "recommend policies for activities designed (A) to promote economy, efficiency, and effectiveness in the administration of, and (B) to prevent and detect fraud and abuse in, [HHS].").

126.    While the recommendations made and reports issued by HHS-OIG in its oversight role are non-binding, CMS looks to these reports and recommendations for policy direction and appropriate implementation of operations. *See id.* § 4(a)(3) (requiring HHS-OIG to "*recommend policies*") (emphasis added); *Id.* § 5(a)(3), (15)–(16) (requiring HHS-OIG, generally, to curate a

list of outstanding recommendations); *see also* HHS-OIG, "OIG's Top Unimplemented Recommendations: Solutions to Reduce Fraud, Waste, and Abuse in HHS Programs," (Dec. 2022), https://oig.hhs.gov/reports-and-publications/compendium/files/compendium2022.pdf (listing recommendations most likely to positively affect cost savings, program effectiveness, and public health and safety, and noting that the "publication is responsive to requirements of the Inspector General Act."). *But see* 5a U.S.C. § 4(a)(1) (granting HHS-OIG the "duty and responsibility" to "*provide policy direction* for . . . audits and investigations") (emphasis added); *see e.g.*, HHS-OIG, "Semiannual Report to Congress: October 1, 2021 - March 31, 2022," (June 6, 2022), https://oig.hhs.gov/reports-and-publications/archives/semiannual/2022/2022-spring-sar.pdf (discussing the number of recommendations implemented by fiscal year).

### B.   Medicare Administrative Appeals Process

127.   If a Medicare provider or supplier wishes to appeal a ZPIC determination, or any post-payment claim denial, they are subject to the lengthy appeals process set forth in 42 U.S.C. § 1395ff. The Medicare appeals regulations allow for five levels of appeal as follows:

#### 1.   Level One: Redetermination

128.   After the initial determination that an overpayment has been made, a denied claim may be submitted to a MAC for redetermination. 42 U.S.C. § 1395ff(a)(3)(A). In the case of a denied claim by a ZPIC, the determination is sent back to the MAC for re-review.

129.   Upon receipt of the request for redetermination, the MAC has sixty days to issue a decision. *Id.* at § 1395ff(a)(3)(C)(ii).

#### 2.   Level Two: Reconsideration

130.   If the redetermination is unfavorable, the appealing party may submit a request for reconsideration. *Id.* at § 1395ff(b), (c).

131.    A reconsideration is a review of the MAC's redetermination conducted by a QIC. *Id.* at §1395ff(c)(B)(i).

132.    Upon receipt of the request for reconsideration, the QIC has sixty days to issue a decision. *Id.* at § 1395ff(c)(3)(C)(i).

### 3.    Level Three: ALJ Hearing

133.    A party that is dissatisfied with the QIC's reconsideration may request a hearing and *de novo* review before an ALJ with OMHA, provided the amount in controversy is met. *Id.* at § 1395ff(b)(1)(E).

134.    The requisite minimum amount in controversy at the time MedEnvios requested an ALJ hearing in the Calendar Year 2018 was $160. CMS, Medicare Program; Medicare Appeals; Adjustment to the Amount in Controversy Threshold Amounts for Calendar Year 2018, 82 Fed. Reg. 45592, 45592 (Sept. 29, 2017).

135.    Under 42 U.S.C. § 1395ff(d)(1)(A), the ALJ must conduct and conclude the hearing and render a decision no later than 90 days after the request for a hearing was filed. *See also* 42 C.F.R. § 405.1016(a).

### 4.    Level Four: Medicare Appeals Council Review

136.    The final administrative option for appeal of an unfavorable decision occurs with the Council. 42 U.S.C. § 1395ff(d)(2); 42 C.F.R. § 405.1108(a).

137.    Under 42 C.F.R. § 405.1100(c), Council undertakes a *de novo* review and issues a decision, dismissal or remands the case to the ALJ within 90 days of receipt of the request for Council review.

### 5.    Level Five: Federal District Court and Escalation

138.    If Council does not issue a decision, dismissal or remand within 90 days, the

appealing party may file a request to escalate the case to federal district court for judicial review. 42 C.F.R. § 405.1132(a).

139.     Upon Council's receipt of the escalation request, Council has five days to issue a decision, dismissal, remand, or provide notice that it is unable to do so. *Id.*

140.     Guidance issued by HHS provides that the appellant party may escalate the appeal to federal court if the adjudication period for the Council to complete its review has elapsed and the Council is unable to issue a decision, dismissal, or remand the case to OMHA. CMS, "Fifth Level of Appeal: Judicial Review in Federal District Court" (Jan. 6, 2022), https://www.cms.gov/Medicare/Appeals-and-Grievances/OrgMedFFSAppeals/Review-Federal-District-Court.

## VI.     STATISTICAL SAMPLING AND EXTRAPOLATION

### A.     The Origins of CMS' Use of Statistical Sampling and Extrapolation

141.     In 1986, through Ruling 86–1, Use of Statistical Sampling to Project Overpayments to Medicare Providers and Suppliers (Feb. 20, 1986), the Health Care Finance Administration ("HCFA"), which was the predecessor to CMS, approved the use of statistical sampling and extrapolation in determining whether there has been an overpayment and in calculating the total amount of any overpayment. Further information regarding CMS Ruling 86-1 is set forth in Section VI.B below.

142.     In 1996, Congress created the Medicare Integrity Program to strengthen the Secretary's ability to deter fraud and abuse. *See* Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104–191, §§ 201–02, 110 Stat.1936, 1992–98 (codified at 42 U.S.C. §§ 1395i(k)(4), 1395ddd).

143.    As part of this "Medicare Integrity Program," Congress authorized the Secretary to "use extrapolation to determine overpayment amounts to be recovered," but in approving the Secretary's use of "extrapolation" in determining Medicare overpayments, Congress provided limited guidance on how the extrapolation was to be performed. *See* 42 U.S.C. § 1395ddd(f)(3)(A).

144.    In 2000, to carry out the congressional objective on using extrapolation, CMS set forth its Medicare guidelines for statistical sampling and overpayment estimation in the MPIM.

145.    As explained further below, the MPIM includes guidelines regarding preservation and documentation of the universe as well as the evaluation and inclusion of zero-paid claims. *See, e.g.,* MPIM Ch. 8, §§ 8.4.7.1; 8.4.4.2; 8.4.5.2; 8.4.3.2.1.

146.    In 2003, Congress' Medicare Prescription Drug, Improvement, and Modernization Act amended the statutory provisions governing overpayment recovery and placed restrictions on the circumstances in which contractors could use extrapolation to calculate the amount a provider or supplier had been overpaid. *See* Pub. L. No. 108–173, §§ 911, 935, 117 Stat. 2066, 2378–86, 2407–11 (codified at 42 U.S.C. §§ 1395kk–1, 1395ddd).

147.    The Medicare Modernization Act mandated that before using extrapolation to determine overpayment amounts to be covered by recoupment, offset, or otherwise, there must be a determination of "sustained or high level of payment error, or documented educational intervention has failed to correct the payment error." *See* 42 U.S.C. §1395ddd(f)(3).

148.    In December 2006, Congress' Tax Relief and Healthcare Act amended the statutory provisions to add a new subsection. *See* Pub. L. 109-432, Div. B, Title III, § 302(a), 120 Stat. 2991 (codified at 42 U.S.C. §1395ddd(h)).

149.    Since December 2006, through the full timeframe of the audit and until present, there has been a requirement set forth in 42 U.S.C. §1395ddd(h) for contractors to identify

underpayments as well as overpayments. *See* Pub. L. 109-432; Pub. L. 111-148, Title VI, § 6402(j)(1); Pub. L. 114-10, Title V, § 505(b); Pub. L. 114-115.

150. As set forth in further detail above in Section IV, to the extent a conflict exists between requirements set forth in a statute or regulation and those in the MPIM, the statute or regulation will govern.

**B.      Intent of HCFA/CMS Ruling 86-1**

151. CMS Ruling 86-1 was the first ruling that allowed a fiscal intermediary to use sampling and extrapolation versus claim-by-claim review.

152. CMS Ruling 86-1 provides that sampling for extrapolation purposes "only creates a presumption of validity as to the amount of an overpayment which may be used as the basis for recoupment." CMS Ruling 86-1 at 11.

153. Following an overpayment determination based on extrapolation, the burden shifts to the Medicare provider or supplier, who "could attack the statistical validity of the sample, or . . . could challenge the correctness of the determination in specific cases identified by the sample[.]" *Id.*

154. Despite citing no statutory or regulatory authority within the ruling, CMS Ruling 86-1 asserted that the use of sampling and extrapolation grew out of the government's supposed federal common law right to recover property.

155. As explained in that ruling, the funds used to pay Medicare claims "belong to the public," and CMS "has the fundamental obligation to ensure that Federal funds are spent only for those purposes permitted by law." *Id.* at 4.

156. The Secretary concluded that sampling provides the only feasible means for protecting the Medicare Trust Fund in situations where a provider or supplier is suspected of

overbilling and the number of claims involved is large. *See Hammad v. Azar*, No. 17-cv-288, 2021 WL 1216383, *1 (N.D. Fla. Jan. 15, 2021) (discussing CMS Ruling 86-1); *Chaves Cnty. Home Health Serv., Inc. v. Sullivan*, 931 F.2d 914, 915–16 (D.C. Cir. 1991) (citing CMS Ruling 86-1 at 10).

157.    CMS emphasized that providers and suppliers should and would have a fair opportunity to contest adverse determinations based on statistical sampling: "Sampling does not deprive a provider of its rights to challenge the sample, nor of its rights to procedural due process." CMS Ruling 86-1 at 11.

### C.     HHS-OIG Oversight Role

158.    As discussed above at Section V.A.6 of this Complaint, HHS-OIG is tasked with objective oversight of HHS, including CMS.

159.    In this role, HHS-OIG reviews existing and proposed legislation and regulations and oversees the implementation of legislation and regulations, including rules governing statistical sampling and extrapolation. *See* 5a U.S.C. § 4(a)(2) (granting HHS-OIG the duty "to review existing and proposed legislation and regulations relating to [HHS] and operations of [HHS]"); *see also* HHS-OIG, "Medicare Contractors Were Not Consistent in How They Reviewed Extrapolated Overpayments in the Provider Appeals Process," A-05-18-00024 (Aug. 2020) (auditing the Medicare claims appeal process and providing recommendations with which CMS concurred).

160.    Moreover, HHS-OIG has the "duty and responsibility" to "provide policy direction for . . . audits and investigations," including policies relevant to statistical sampling and extrapolation. 5a U.S.C. § 4(a)(1).

D.      **Intent of MPIM Chapter 8.4**

161.    The MPIM, Chapter 8, Section 4, provides detailed requirements for CMS contractors in developing an audit plan and executing the sampling and extrapolation process.

162.    There have been multiple revisions to the MPIM since its inception in 2000, but for purposes of this proceeding, the version of the MPIM that was in effect at the time of the audit of Plaintiff's Medicare claims provides the standards for proper execution of the sampling and extrapolation process. *See, e.g., Hammad*, 2021 WL 1216383, at *2 (N.D. Fla. Jan. 15, 2021).

163.     The MPIM's guidelines "are provided to ensure that a statistically valid sample is drawn and that statistically valid methods are used to project an overpayment where the results of the review indicate that overpayments have been made." MPIM Ch. 8, § 8.4.1.1.

164.    MPIM guidelines on sampling and extrapolation are intended to strike a balance between precise estimates that may not be "administratively or economically feasible for contractors performing audits" and the need to ensure that "the provider/supplier is treated fairly despite any imprecision in the estimation." *See Rio*, 2019 WL 1411805 at *29.

165.    Ultimately, while CMS does not require its contractors to use particular statistical practices and gives its contractors some leeway to make errors in their methodology, the test is whether the methodology is statistically valid, and the cumulative effect of several otherwise allowable errors may render a statistical extrapolation invalid. *See Central Louisiana Home Health Care, LLC v. Price*, No. 17-cv-00346, 2018 WL 7888523, at *16-*20 (W.D. La. Dec. 28, 2018), ("[F]ailure to adhere to several or all of these safeguards should eliminate the presumption that the statistical analysis is valid.")

E.      **Six Mandatory Steps of Statistical Sampling and Extrapolation**

166.    MPIM Chapter 8.4 sets forth "[t]he major steps in conducting statistical sampling,"

and articulates a number of criteria that govern the specifics of each step in the extrapolation process. *See* MPIM Ch. 8, § 8.4.1.3.

167.    Under the version of MPIM Ch. 8, § 8.4.1.3. applicable during the statistical sampling and extrapolation at issue in this matter, the six mandatory steps were:

> (1)    Selecting the provider or supplier;
>
> (2)    Selecting the period to be reviewed;
>
> (3)    Defining the universe, the sampling unit, and the sampling frame;
>
> (4)    Designing the sampling plan and selecting the sample;
>
> (5)    Reviewing each of the sampling units and determining if there was an overpayment or an underpayment; and, as applicable,
>
> (6)    Estimating the overpayment.

168.    In order for the contractor to carry its burden to demonstrate that the probability sample and, by extension, the extrapolation were valid, the contractor must show satisfactory compliance with each of these six major steps. *See also Hammad*, 2021 WL 1216383, at *2 (noting that, in conducting a post-payment audit, CMS has promulgated guidelines that contain [these] requirements for sampling and overpayment estimation").

**F.    Defining the Universe and Recreating the Sampling Frame**

169.    For purposes of extrapolation, the "target universe" of a provider or supplier's Medicare claims consists of all claims submitted by the provider or supplier within the chosen time period. *See* MPIM Ch. 8, § 8.4.3.1. The universe and sampling frame will usually cover all relevant claims or line items for the period under review. *See Id.*at § 8.4.3.2.

170.    An MPIM-compliant universe "shall consist of all fully and partially paid claims submitted by the supplier for the period selected for review and for the sampling units to be reviewed." *Id*. at § 8.4.3.2.1.

171.    More specifically, pursuant to MPIM Ch. 8, § 8.4.7.1, when a contractor seeks to recover an overpayment it shall include, in the overpayment demand letter, information about the review and statistical sampling methodology that was followed, which shall include:

- A description of the universe, the frame, and the sample design;

- A definition of the sampling unit, the sample selection procedure followed, and the numbers and definitions of the strata and size of the sample, including allocations, if stratified; the time period under review;

- The sample results, including the overpayment estimation methodology and the calculated sampling error as estimated from the sample results;

- The amount of the actual overpayment/underpayment from each of the claims reviewed; [and]

- [A] list of any problems/issues identified during the review and any recommended corrective actions.

172.    The purpose of these documentation requirements is to ensure that the sampling frame and the sample can be replicated in the event that the methodology is challenged.

173.    More specifically, as set forth in MPIM Ch. 8, § 8.4.4.2, the contractor "shall document all steps taken in the random selection process exactly as done to ensure that the necessary information is available for anyone attempting to replicate the sample selection."

174.    Additionally, as set forth in MPIM Ch. 8, § 8.4.4.4.1, "[a]n explicit statement of how the universe is defined and elements included shall be made and maintained in writing" and "[s]ufficient documentation shall be kept so that the sampling frame can be re-created, should the methodology be challenged."

175.    A failure to comply with the MPIM mandate to carefully document, preserve, and produce a statistical sampling and extrapolation from start to finish denies a provider/supplier the Due Process right to recreate or replicate the process to determine if it was performed correctly

and determine if a valid challenge should be raised. *See Global Home Care, Inc. v. National Government Services*, Docket No. M-11-116, HHS, DAB (Jan. 11, 2011) (holding that "[w]ithout this basic documentation, a provider does not have the information and data necessary to mount a Due Process challenge to the statistical validity of the sample, as is its right under CMS Ruling 86-1").

176.    Where a provider or supplier is denied its Due Process right to dispute and contest an extrapolated overpayment, a provider/supplier is not extended appeal rights in accordance with 42 U.S.C. § 1395ff(b), and the provider or supplier is also deprived of the statutory protection against premature recoupment under 42 U.S.C. § 1395ddd(f)(2).

177.    In other words, a "failure to supply the provider with sufficient documentation to recreate the sampling frame and sample effectively deprives the provider of its right to challenge the statistical validity of the sample and thus may constitute a ground for invalidating the overpayment extrapolation." *LivinRite*, 386 F. Supp. 3d at 654.

### G.    Removal of Zero-Paid Claims

#### 1.    The Process & the MPIM

178.    As noted above, the "universe" of a provider or supplier's Medicare claims consists of all claims submitted by the provider or supplier and adjudicated by CMS within the chosen time period.

179.    Once the sampling unit is selected, certain limiting criteria are then applied to the universe, and the resulting set of sampling unit data in the universe is called the "sampling frame."

180.    Once the sampling plan is selected, the sampling units are chosen randomly from the frame or strata frame through use of a computer program.

181.    Once the sample is constructed, each sampling unit is audited by the contractor's medical review staff to determine whether the claim was properly paid, overpaid, underpaid, or an improperly denied payment.

182.    Upon completion of the medical record review, the contractor's staff will calculate the net average amount by which the provider or supplier was overpaid for the sampled claims by reducing the overpayment amount by the underpayment amount.

183.    This actual average overpayment amount, the net overpayment on the ample set, is then projected to the sampling frame of that provider or supplier's claims to form the extrapolated net overpayment amount.

184.    In order for the above process to function properly and not be biased against the provider or supplier, underpayments, including claims that were unpaid after adjudication or zero-paid claims, must be present in the universe, sampling frame, and sample to ensure the actual net overpayment is calculated.

185.    With regard to unpaid claims, as previously noted, an MPIM-compliant universe "shall consist of all fully and partially paid claims submitted by the supplier for the period selected for review and for the sampling units to be reviewed." All unpaid claims are partially paid and potentially underpaid claims. MPIM Ch. 8, § 8.4.3.2.1.

186.    Under MPIM Ch. 8, § 8.4.1.3, an auditor is instructed to "Review . . . each of the sampling units and determin[e] if there was an overpayment or an underpayment."

187.    Further, under MPIM Ch. 8, § 8.4.7.1, "the explanation of the sampling methodology that was followed shall include…the amount of the actual overpayment/underpayment from each of the claims reviewed."

37

188.     Additionally, MPIM Ch. 8, § 8.4.4.4.4, states overpayments shall be documented in a worksheet with "data on the claim number, line item, amount paid, audited value… etc." and that the "underpayments identified during reviews shall be similarly documented."

189.     Moreover, during the medical review process, any "[s]ampling units that are found to be underpayments, in whole or in part, are recorded as negative overpayments and shall also be used in calculating the estimated overpayment." *Id*. at § 8.4.5.2.

## 2.     HHS-OIG Policy

190.     HHS-OIG has expressly indicated, in the context of Corporate Integrity Agreements ("CIAs"), that Independent Review Organizations ("IROs") performing audit work must include underpayments to calculate the net overpayment in setting the actual overpayment owed under CIAs. *See e.g.*, HHS-OIG, "Integrity Agreement Between the Office of Inspector General of the Department of Health and Human Services and Kevin P. Greene, M.D. and Feel Well Health Center of Southington, P.C.," App'x B, at 1 (Nov. 8, 2022), https://www.oig.hhs.gov/fraud/cia/agreements/Kevin_P_Greene_MD_and_Feel_Well_Health_C enter_of_Southington_PC_11082022.pdf (stating that a "net Overpayment shall be calculated by subtracting all underpayments identified in the Claims Review Sample from all Overpayments identified in the Claims Review Sample"); *see also* Laura Ellis, "CIA Changes on the Horizon: What They Are and What They May Mean For You," Speech at Am. Health L. Assoc. Conference (Sept. 29, 2022) (discussing this shift in policy for CIAs in her capacity as Senior Counsel in the Office of Counsel to HHS-OIG).

191.     This change by HHS-OIG is reflected in the definition of "Error Rate" utilized in the CIAs it enters with providers.

192.    Previously, HHS-OIG had instructed IROs to calculate an Error Rate for CIA purposes "by dividing the Overpayment in the Claims Review Sample by the total dollar amount associated with the Paid Claims in the Claims Review Sample." *See e.g.*, HHS-OIG, "Corporate Integrity Agreement Between the Office of Inspector General of the Department of Health and Human Services and VirtuOx, Inc.," App'x B, at 5 (May 11, 2022), https://www.oig.hhs.gov/fraud/cia/agreements/VirtuOx_Inc_05112022.pdf.

193.    Now, HHS-OIG has updated their policy to expressly require the inclusion of underpayments—including zero-paid claims—re-defining "Error Rate" as "the percentage of net Overpayments identified in the Claims Review Sample. The net Overpayment shall be calculated *by subtracting all underpayments identified* in the Claims Review Sample from all Overpayments identified in the Claims Review Sample." *See e.g.*, HHS-OIG, "Corporate Integrity Agreement Between the Office of Inspector General of the Department of Health and Human Services and CHC-FLA, LLC," App'x B, at 1 (Sept. 26, 2022), https://www.oig.hhs.gov/fraud/cia/agreements/CHC-FLA_Inc_09262022.pdf (emphasis added).

**H.    Documentation of Recalculated Demand**

194.    If a decision on appeal reverses one or more of the initial claim determinations, "the estimate of overpayment shall be recomputed and a revised projection of overpayment issued." MPIM Ch.8, § 8.4.9.2; *see also id.* at Ch.8, § 8.4.9.

195.    The contractor then must "include in the overpayment demand letter information about the review and statistical sampling methodology that was followed." *Id.* at Ch. 8, § 8.4.7.1.

196.    In addition, the contractor must maintain complete documentation of the sampling methodology that was followed in recalculating the overpayment. *Id.* at Ch. 8, § 8.4.4.4.

197.    As with the initial statistical sampling and extrapolation methodology, the purpose of these documentation requirements in recalculation is to ensure that the sampling frame and the sample can be replicated in the event that the recalculation methodology is challenged. *Id.* at Ch. 8, § 8.4.4.4.1.

198.    A failure to comply with the MPIM mandate to carefully document, preserve, and produce a statistical sampling and extrapolation from start to finish for a recalculated overpayment demand denies a provider/supplier the Due Process right to recreate or replicate the process to determine if it was performed correctly and determine if a valid challenge should be raised. *See Global Home Care*, Docket No. M-11-116 (holding that "[w]ithout this basic documentation, a provider does not have the information and data necessary to mount a Due Process challenge to the statistical validity of the sample, as is its right under CMS Ruling 86-1").

199.    Where a provider or supplier is denied its Due Process right to dispute and contest an extrapolated overpayment—including a recalculated overpayment, a provider/supplier is not extended appeal rights in accordance with 42 U.S.C. § 1395ff(b), and the provider or supplier is also deprived of the statutory protection against premature recoupment under 42 U.S.C. § 1395ddd(f)(2).

## VII.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

200.    MedEnvios seeks judicial review of the Secretary's extrapolated overpayment demand plus interest assessed on claims submitted by MedEnvios, and previously paid by Medicare, for dates of service between January 28, 2013 to January 28, 2016, (the "Review Period")

### A.    ZPIC Post-Payment Audit

201.    On December 30, 2016, CMS' ZPIC, Health Integrity, LLC ("Health Integrity"),

sent MedEnvios a letter requesting additional documentation ("ADR Letter") regarding 66 claim lines for 37 Medicare beneficiaries who received DMEPOS during the Review Period, as part of a post-payment audit.

202.     MedEnvios promptly replied, providing all of the requested information in MedEnvios' possession.

203.     On May 16, 2017, Health Integrity sent MedEnvios the results (tracking number # 18776/MR) of its review of the requested documentation ("Initial Determination Letter"). According to a spreadsheet enclosed with the Initial Determination Letter called "Extrapolation of Overpayment for Simple Random Sample with Certainty" the actual overpayment amount was $18,441.85 and the extrapolated overpayment amount was $947,843.11.

204.     Included with the Initial Determination Letter was a CD, which purported to be an explanation and details of the findings. The CD's contents included the following: 1) information regarding the medical review; 2) the Provider Education document; and 3) the Sampling Methodology, which provided a description of the Statistically Valid Random Sample ("SVRS") and how the overpayment was determined.

205.     However, the CD did not contain sufficient information necessary for MedEnvios to recreate the statistical sampling and appeal the extrapolation as required by the MPIM.

206.     Specifically, the CD did not contain the complete, actual universe of claims; rather it included a file named "universe" which was a misnomer.

207.     Health Integrity's purported Universe file included only fully and partially paid claim lines; all unpaid claims had been removed.

208.     The purported Universe file also included only the claim lines for the sampling frame, not all the claims for the Review Period from which the sampling frame had been created.

209.    On June 9, 2017, CGS Administrators, LLC ("CGS") sent an overpayment demand letter to MedEnvios, requesting $947,843.11 in an extrapolated overpayment for alleged Medicare payment errors stemming from claim denials determined by Health Integrity (the "Demand Letter").

**B.     Level One: Redetermination**

210.    On July 7, 2017, MedEnvios sent CGS its Request for Redetermination based on the Initial Determination Letter and the Demand Letter (the "Redetermination Request").

211.    In its Redetermination Request, MedEnvios appealed all individual claims denied for not meeting the Medicare guidelines, and provided documentation supporting that the services were appropriately ordered and issued to the Medicare beneficiaries.

212.    On August 21, 2017, CGS sent MedEnvios an unfavorable Redetermination Decision ("Redetermination Decision") upholding the results of Health Integrity's Initial Determination Letter.

213.    In its Redetermination Decision, CGS claimed to have verified the statistical sampling methodology and overpayment calculation and indicated the results supported a valid sample and the estimated overpayment was reasonable.

214.    However, CGS' Redetermination Decision failed to address the fact that Health Integrity failed to provide MedEnvios any documentation of the complete, actual universe of claims and that Health Integrity had improperly removed zero-paid claims from the universe and sampling frame.

**C.     Level Two: Reconsideration**

215.    Following CGS' unfavorable Redetermination Decision, MedEnvios retained Dr. Jeffrey Witmer, a professor and statistical expert in the healthcare field.

216.     In his expert report dated October 3, 2017, Dr. Witmer confirmed that Health Integrity did not provide the required documentation necessary for MedEnvios to recreate the statistical sampling and extrapolation as required by the MPIM.

217.     Dr. Witmer's report found that that Health Integrity's extrapolation failed to comply with the standards set forth in the MPIM Chapter 8.4. Specifically, Dr. Witmer's primary conclusions were as follows:

- Health Integrity never provided a copy of the universe file;

- The omission of zero-paid claims biased the extrapolation;

- Health Integrity failed to meet precision standards; and

- Health Integrity violated MPIM §8.4.3.1 concerning the audit review period.

218.     On October 18, 2017, MedEnvios timely submitted a Request for Reconsideration to the QIC, C2C Solutions, Inc. ("C2C") in response to CGS' unfavorable decision.

219.     As support for its Request for Reconsideration, MedEnvios submitted the ADR letter, the Initial Determination letter, the Demand letter, its Redetermination Request, the Redetermination Decision, Dr. Witmer's Report, and medical documentation supporting all of the claims.

220.     On January 5, 2018, C2C issued its partially favorable Reconsideration Decision. In its Reconsideration Decision, C2C overturned several patients' individual claims but upheld the statistical sampling methodology as reasonable, asserting that its statistician was able to identify the universe and replicate the sample and overpayment amount.

221.     On March 5, 2018, CGS issued a Recalculated Overpayment Demand Letter ("Recalculated Demand") pursuant to the partially favorable Reconsideration Decision, decreasing

the overpayment amount owed from \$947,843.11 to \$778,237.11 (plus \$51,882.48 in interest, totaling \$830,119.59).

222.     However, CGS failed to provide any documentation to support the Recalculated Demand, including any documentation or explanation as to how this amount was calculated and any statistical analysis and work that went into recalculating the overpayment.

**D.     Level Three: ALJ Hearing**

223.     On March 2, 2018, MedEnvios timely filed its Request for an ALJ Hearing, appealing C2C's Reconsideration Decision.

224.     On November 29, 2018, OMHA acknowledged receipt of MedEnvios' Request for ALJ Hearing.

225.     On May 30, 2019, OMHA notified MedEnvios that there would be a delay before the appeal could be assigned to an adjudicator.

**1.     OMHA Administrative Record**

226.     Over two years later, after the case was assigned to the Honorable ALJ Jamie Mendelson, she sent a Request for Information letter on December 3, 2021 to Maximus Federal Services, Inc. ("Maximus"), a Part B DMEPOS QIC, regarding a deficiency in the administrative record case file and requested that the statistical sampling documents from the ZPIC be produced in Excel format, rather than PDF format.

227.     On December 21, 2021, MedEnvios requested a copy of the ALJ's administrative record case file.

228.     On or around December 29, 2021, MedEnvios received a copy of the case file.

229.    On February 17, 2022, Maximus responded to the ALJ's December 3, 2021 Request for Information and uploaded the spreadsheets to ECAPE, but did not provide a copy to MedEnvios.

230.    On February 17, 2022, the ALJ provided MedEnvios' counsel a copy of the documents produced by Maximus.

231.    MedEnvios analyzed the documents from Maximus and confirmed they were identical to the original copies of these documents in the case file and still did not include a copy of the actual universe of claims.

### 2.    Prehearing Conference and Notice of Hearing

232.    On December 22, 2021, OMHA sent MedEnvios a Prehearing Conference Notice.

233.    On February 17, 2022, MedEnvios' counsel participated in a Prehearing Conference.

234.    On February 18, 2022, ALJ Mendelson issued a Prehearing Conference Order setting the hearing and pre-hearing briefing submissions.

235.    On March 1, 2022, MedEnvios received a Notice of Hearing.

236.    On March 7, 2022 MedEnvios received an Amended Notice of Hearing indicating the hearing was rescheduled to May 17 – 18, 2022 via video-teleconference (the "ALJ Hearing").

### 3.    ALJ's Request for Information Regarding the Recalculated Demand

237.    On, March 21, 2022 ALJ Mendelson sent another Request for Information to Maximus for a copy of the recalculated extrapolation and a copy of the Recalculated Demand Letter pursuant to the partially favorable Reconsideration Decision.

238.    On April 7, 2022, OMHA received Maximus' response to the March 21, 2022 Request for Information.

239.    On April 25, 2022, counsel for MedEnvios received from OMHA a copy of the additional documents from Maximus regarding the Recalculated Demand.

240.    MedEnvios analyzed these documents and confirmed they did not change any of the amounts or data that MedEnvios had previously received from the QIC and confirmed the documents still did not contain sufficient information to verify the recalculated overpayment amount.

### 4.    ALJ Brief and Hearing

241.    On May 3, 2022, MedEnvios submitted a brief in support of the hearing for OMHA Appeal 3-6898784538, in which MedEnvios incorporated all arguments previously asserted and included additional evidence supporting its position that the extrapolation was invalid.

242.    With its brief, MedEnvios submitted Dr. Witmer's supplemental expert report dated April 28, 2022.

243.    The ALJ Hearing was held on May 17-18, 2022 via video-teleconference.

244.    The ALJ had notified the CMS contractors of the hearing, but neither CGS, Maximus, nor C2C elected to participate in the hearing.

245.    During the ALJ Hearing, Dr. Witmer and counsel for MedEnvios challenged the validity of the statistical sampling due to Health Integrity's failure to produce the actual, complete universe of claims and due to Health Integrity's improper exclusion of zero-paid claims from the universe and sampling frame.

246.    During the hearing, counsel for MedEnvios also made individualized arguments on each of the individual disputed claims.

### 5.    ALJ Notice of Decision

247.    On June 15, 2022, OMHA issued a partially favorable ALJ Decision (the

"Decision"). A redacted copy[3] of the Decision is attached as **Exhibit 1**.

248.     In her Decision, ALJ Mendelson upheld the statistical sampling and extrapolation methodology as valid.

249.     However, ALJ Mendelson overturned some of the individual claims, stating: "[s]ome claims in the SSOE sample are covered or partially covered by Medicare, as discussed in this decision and as summarized in the 'Table of Sample Claims and Dispositions'… The Medicare contractor shall recalculate the extrapolated overpayment, based on this partially favorable decision."

        **E.**      **Level Four: Medicare Appeals Council Review**

250.     On August 12, 2022, MedEnvios timely and electronically filed its Medicare Appeals Council Review Request with Council requesting review of the ALJ's Decision.

251.     To date, MedEnvios has not received a decision, dismissal, or remand by Council.

        **F.**      **Partial Refund and Recalculation of Overpayment in Accordance with ALJ's Partially Favorable Decision**

252.     On July 28, 2022, CGS issued a partial refund to MedEnvios pursuant to the partially favorable ALJ Decision in the amount $71,479.23 ($47,601.00 principle; $23,878.23 interest) and the revised overpayment amount was $730,636.11, plus applicable interest.

253.     However, CGS again failed to provide any documentation to support the refund or revised overpayment amount, including any documentation or explanation as to how these amounts were calculated and any statistical analysis and work that went into recalculating the refund and revised overpayment amount.

---

[3] A redacted copy is attached removing all PHI.

### G.      Level Five: Federal District Court and Escalation

254.    On November 11, 2022, MedEnvios electronically filed a letter to Council requesting escalation to federal district court if Council was unable to timely issue a decision.

255.    On November 21, 2022, after Council failed to respond within the required five-day timeframe, MedEnvios electronically filed a letter to Council reiterating its intent to escalate.

256.    To date, Council has failed to respond to any of MedEnvios' letters regarding its request for escalation.

## VIII.   CAUSES OF ACTION

### Count One: Health Integrity's Failure to Produce the Universe of Claims in its Statistical Sampling Violated Plaintiff's Right to Due Process.

257.    Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 256 as if fully set forth herein.

258.    The Secretary's decision was not supported by substantial evidence, applied improper legal standards, and was arbitrary, capricious, and not in accordance with the law.

259.    Plaintiff has a valid property interest in receiving Medicare payments for services rendered.

260.    The Secretary and his agents failed to provide the actual, complete universe of claims used in Health Integrity's statistical sampling and extrapolation, failed to properly define the universe, and failed to provide the information necessary to recreate the sampling frame.

261.    Plaintiff complained at each appeal level and requested this information, but Plaintiff was continually denied access to this information.

262.    The Secretary and his agents willfully, deliberately, and unjustifiably withheld for over five years, and continue to withhold to date, this critical statistical information from the Plaintiff.

263.    Without this statistical information, Plaintiff was deprived of its right to independently verify the Secretary and his agents' alleged overpayment amount throughout the entire administrative appeals process.

264.    This withholding of the actual, complete universe and other documentation necessary to recreate the statistical sampling and extrapolation violates Plaintiff's appeal rights under 42 U.S.C. § 1395ff(b), and also deprives Plaintiff of the statutory protection against premature recoupment under 42 U.S.C. §1395ddd(f)(2).

265.    Plaintiff's Due Process rights under the Fifth and Fourteen Amendment of the Constitution have been infringed.

266.    Plaintiff is entitled to an order from this Court invalidating the extrapolation at issue.

**Count Two: Health Integrity's Failure to Include Zero-Paid Claims in its Statistical Sampling Violated Plaintiff's Right to Due Process.**

267.    Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 266 as if fully set forth herein.

268.    The Secretary's decision was not supported by substantial evidence, applied improper legal standards, and was arbitrary, capricious, and not in accordance with the law.

269.    Health Integrity improperly excluded zero-paid claims from the sampling frame in conducting its statistical sampling and extrapolation, in violation of statutory and regulatory mandates and MPIM guidance.

270.    Failure to include zero-paid claims leads to a statistical sampling that is biased against the provider and causes the extrapolated demand to be exaggerated.

271.    This procedural failure violates Plaintiff's right to Due Process and warrants invalidation the statistical sampling, because the failure to include unpaid claims represents a material flaw.

272.    Plaintiff is entitled to an order from this Court invalidating the extrapolation at issue.

**Count Three: CGS' Failure to Provide Documentation to Support the Recalculated Demands Violated Plaintiff's Right to Due Process.**

273.    Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 272 as if fully set forth herein.

274.    The Secretary's decision was not supported by substantial evidence, applied improper legal standards, and was arbitrary, capricious, and not in accordance with the law.

275.    Plaintiff has a valid property interest in receiving Medicare payments for services rendered.

276.    Following the partially favorable Reconsideration Decision and the partially favorable ALJ Decision, the Secretary and his agents failed to provide documentation to support the Recalculated Demands, including any documentation or explanation as to how these amounts were calculated and any statistical analysis and work that went into recalculating the overpayment amounts.

277.    Plaintiff complained at ALJ and Council levels and repeatedly requested this information, but Plaintiff was continually denied access.

278.    Without this statistical information, Plaintiff was deprived of its right to independently verify the Secretary and his agents' alleged, recalculated overpayment amount throughout the administrative appeals process.

279.    This withholding of the documentation necessary to recreate the statistical sampling and extrapolations used in recalculating the overpayment demands violates Plaintiff's appeal rights under 42 U.S.C. § 1395ff(b).

280.    Plaintiff's Due Process rights under the Fifth and Fourteen Amendment of the Constitution have been infringed.

281.    Plaintiff is entitled to an order from this Court invalidating the extrapolation at issue.

**Count Four: The ALJ's Delay Led to an Improper Accumulation of Interest in Violation of Plaintiff's Right to Due Process.**

282.    Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 281 as if fully set forth herein.

283.    The Secretary's decision was not supported by substantial evidence, applied improper legal standards, and was arbitrary, capricious, and not in accordance with the law.

284.    The Secretary was statutorily required to provide Plaintiff with an ALJ hearing and decision within 90 days of its request.

285.    The Secretary failed to do so and, in fact, failed to provide Plaintiff with an ALJ hearing and decision for over four years.

286.    The Secretary's extreme delay led to an accumulation of undue interest in an amount to be determined upon CMS issuing a proper accounting.

287.    Plaintiff could not prevent this accumulation given that escalation past the ALJ to Council and the federal district court would not afford adequate procedural due process protections.

288.    Plaintiff is entitled to a suspension of the accrual of interest on the alleged overpayment and repayment, in full, of any interest assessed and collected to date.

**Count Five: The Secretary Improperly Recouped Funds in Violation of the Social Security Act and in Violation of Plaintiff's Right to Due Process.**

289.    Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 288 as if fully set forth herein.

290.    The Secretary's decision was not supported by substantial evidence, applied improper legal standards, and was arbitrary, capricious, and not in accordance with the law.

291.    The Secretary issued a notice of the alleged extrapolated overpayment while withholding certain statistical sampling documentation it was required to provide to Plaintiff, which denied to Plaintiff their Due Process rights and a meaningful opportunity to dispute and contest the extrapolated overpayment.

292.    The Secretary has imposed recoupment of Plaintiff's Medicare payments and collected in excess of the alleged overpayment, with interest, even though Plaintiff has been deprived of a meaningful opportunity to challenge this calculation.

293.    Plaintiff is entitled to a suspension of any ongoing recoupment of the alleged overpayment, and a refund of all improperly recouped amounts and interest.

**Count Six: The Secretary Improperly Accounted for Payments Made by Plaintiff and Deprived Plaintiff of Its Property and Due Process Rights.**

294.    Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 293 as if fully set forth herein.

295.    The Secretary's decision was not supported by substantial evidence, applied improper legal standards, and was arbitrary, capricious, and not in accordance with the law.

296.    The Secretary and its contractors have failed to account for, or otherwise misapplied an amount to be determined upon CMS providing a proper accounting, in payments made by Plaintiff in relation to the underlying Medicare claims appeal and two interrelated appeals.

297.    This error infringed on Plaintiff's Due Process rights under the Fifth and Fourteenth Amendments of the Constitution.

298.    The necessary, missing documentation regarding proper accounting could only be provided to Plaintiff by CMS or its contractors, as these are the only entities that could have documentation regarding the total amount recouped from Plaintiff.

299.    Plaintiff is entitled to an order mandating that the ALJ require CMS or its contractors to perform a full accounting of Plaintiff's debts related to the claims at issue from inception to present.

## IX.    PRAYER FOR RELIEF

300.    For these reasons, Plaintiff prays for judgment against Defendant for the following:

**Count One.**

      A.    An order from this Court invalidating the extrapolation.

      B.    A declaratory judgment that Defendant has violated Plaintiff's Due Process rights.

**Count Two.**

      A.    An order from this Court invalidating the extrapolation.

      B.    A declaratory judgment that Defendant has violated Plaintiff's Due Process rights.

**Count Three.**

      A.    An order from this Court invalidating the extrapolation.

      B.    A declaratory judgment that Defendant has violated Plaintiff's Due Process rights.

**Count Four.**

 A. A suspension of the accrual of interest on the alleged overpayment and repayment, in full, of any interest assessed and collected to date.

 B. An order from this Court requiring CMS or its contractors perform a full accounting of Plaintiff's debts related to the claims at issue from inception to the present.

 C. A declaratory judgment that Defendant has violated Plaintiff's Due Process rights.

**Count Five.**

 A. A suspension of any ongoing recoupment of the alleged overpayment.

 B. A refund of all improperly recouped amounts and interest therefrom.

 C. A declaratory judgment that Defendant has deprived Plaintiff of the statutory protections against premature recoupment under 42 U.S.C. §1395ddd(f)(2).

**Count Six.**

 A. An order from this Court requiring CMS or its contractors to perform a full accounting of Plaintiff's debts related to the claims at issue from inception to present.

 B. A declaratory judgment that Defendant has violated Plaintiff's Due Process rights.

**Additional Relief Requested.**

 A. Prejudgment and post-judgment interest;

 B. Reasonable attorney's fees and costs of suit; and

C. Such other and further relief as the Court may deem just and proper under law.

Dated: January 6, 2023                    Respectfully Submitted,


                                          */s/Mallory M. Cooney*
                                          Mallory M. Cooney
                                          Florida Bar No. 125659
                                          mallory.cooney@klgates.com
                                          K&L GATES LLP
                                          200 S. Biscayne Boulevard, Suite 3900
                                          Miami, Florida 33131
                                          Telephone:  (305) 539-3300
                                          Facsimile:   (305) 358-7095

                                          *Counsel for Plaintiff*